UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                    Case No. 8:20-cr-176-TPB-AEP

MICHAEL C. JENKINS,

    Defendant.
_____/

## REPORT AND RECOMMENDATION

This MATTER is before the Court on Defendant Michael C. Jenkins' ("Defendant") Motion to Suppress Evidence ("Motion") (Doc. 27) and the United States' Response in Opposition to Defendant's Motion to Suppress (Doc. 29). The matter was referred by the district judge to the undersigned for a Report and Recommendation (Doc. 32). By his Motion, Defendant requests that the Court suppress any and all statements, and evidence arising therefrom, that were seized or obtained in violation of Defendant's Fifth Amendment rights on May 19, 2020. Specifically, Defendant asserts that his Fifth Amendment rights were self-executing at the time law enforcement questioned him and that law enforcement engaged in prohibited two-step interrogation tactics.  "A violation of the Fifth Amendment occurs when the accused is compelled to make a Testimonial Communication that is incriminating." *McKathan v. United States*, 969 F.3d 1213, 1223 (11th Cir. 2020) (internal quotations omitted). The Fifth Amendment additionally prohibits

prosecutorial authorities from using "evidence derived directly and indirectly" from the individual's compelled statements. *Id.* (citing *Kastigar v. United States*, 406 U.S. 441, 453 (1972)). Generally, the Fifth Amendment is not self-executing; an individual must claim the privilege for their statement to be considered compelled. *Minnesota v. Murphy*, 465 U.S. 420, 427 (1984). The Fifth Amendment is, however, self-executing in certain limited circumstances where "the government denies an individual a 'free choice' to either speak or remain silent." *McKathan*, 969 F.3d at 1224 (citing *Murphy*, 465 U.S. at 434-35). Defendant asserts that he was denied a free choice because he was in custody at the time that he was questioned, he was subject to a classic penalty situation as a result of the terms of his probation, and law enforcement delayed giving a *Miranda* warning to elicit a confession. Contrary to Defendant's position, the United States asserts that Defendant was not denied a free choice to speak or remain silent because he was not under arrest or in custody at the time he was questioned, the questioning by Tampa Police Department ("TPD") Officer Stephen Tidwell did not implicate Defendant's terms of probation and thus did not rise to the level of a classic penalty situation, and law enforcement used no coercive tactics in obtaining Defendant's statements.

On October 28, 2020, the Court conducted an evidentiary hearing on Defendant's Motion, during which Defendant called as witnesses TPD Detectives Benjamin Bors and Julio Tagliani, and the United States called as witnesses TPD Officer Stephen Tidwell, TPD Detective John Guzina, and Florida Department of Corrections Probation and Parole ("FDCPP") Officer Michael Cotignola. Upon

careful consideration of the positions of the parties and the evidence of record, the undersigned finds, for the reasons stated herein, that Defendant's statements in response to questions by Officer Tidwell on May 19, 2020, were not obtained in violation of Defendant's Fifth Amendment rights, but that Defendant's statements in response to questions by Detective Guzina and Officer Cotignola after the conclusion of Officer Tidwell's questioning were obtained in violation of Defendant's Fifth Amendment rights. Thus, the undersigned finds that Defendant's Motion (Doc. 27) is due to be denied in part and granted in part.

## I. Findings of Fact

On May 19, 2020 at approximately 5:30 a.m., members of the FBI, assisted by members of the TPD Internet Crimes Against Children Task Force ("ICAC") and Tampa Area Crimes Against Children Task Force ("TACAC"), executed a federal search warrant at 2006 E. Elmwood Avenue, Tampa, Florida 33605, where Defendant resided. Approximately one hour prior to the execution of the warrant, Detective Guzina and Officer Cotignola arrived at Defendant's residence in Detective Guzina's vehicle where they remained until the initial entry was complete and all of the residents had exited the residence. During the initial entry, Defendant was escorted from the house along with all other residents of the house. None of the residents were handcuffed or otherwise physically restrained during the execution of the warrant.

After Defendant exited the residence, Officer Tidwell made contact with Defendant and performed a routine pat down for officer safety. Officer Tidwell

removed Defendant's phone and wallet from Defendant's pocket and placed them on the hood of a law enforcement vehicle. Officer Tidwell asked whether Defendant would be willing to speak with him and Defendant responded that he was willing. When Officer Tidwell suggested that they speak inside Tidwell's vehicle, Defendant did not object. No other law enforcement officers were engaged in speaking with Defendant when he agreed to speak with Officer Tidwell inside the vehicle. Officer Tidwell asked Defendant to sit in the front passenger seat of the vehicle and Defendant did so, closing the vehicle door himself after entering the vehicle.

Detective Guzina and Officer Cotignola joined Defendant and Officer Tidwell in the vehicle after Defendant had entered the vehicle. Detective Guzina was seated directly behind Defendant in the rear passenger seat and Officer Cotignola was seated directly behind Officer Tidwell. At no prior point that day did either Detective Guzina or Officer Cotignola have any communication with Defendant. Prior to asking any questions during the interview, Officer Tidwell informed Defendant twice that he was not under arrest and did not have to speak to Officer Tidwell and once that Defendant was free to go at any time. Detective Guzina and Officer Cotignola were present in the vehicle when Defendant was informed that he did not have to speak to Officer Tidwell. Officer Tidwell then proceeded to ask Defendant questions related to the ongoing federal criminal investigation. After Officer Tidwell concluded his questioning, Detective Guzina

and Officer Cotignola asked Defendant questions related to his probation and sex offender registry requirements.

At some point during the interview the windows were rolled up due to noise, but at no point were any of the doors of the vehicle locked. The vehicle had no insignia or other characteristics that would alert a passenger that it was a law enforcement vehicle. While all three members of law enforcement present at the interview had weapons on their persons, the weapons remained holstered before, during, and after the interview. At the conclusion of the interview, Defendant exited the vehicle and was given a chair so that he could sit in the driveway while law enforcement continued to execute the search warrant. At some point after the conclusion of the interview and during the execution of the search warrant, Defendant requested to use the restroom and was escorted into the residence to do so. Approximately 15-20 minutes after the conclusion of the interview, Officer Cotignola removed Defendant's electronic monitoring equipment so that Defendant could be transported by the FBI. After arriving at the Tampa FBI Office, Defendant was read his *Miranda* rights.

## II. Analysis and Conclusions of Law[1]

The primary issue before the Court is whether the statements given by Defendant prior to his arrest should be suppressed. The Fifth Amendment protects individuals from compelled self-incrimination. U.S. Const. amend. V; *Miranda v.*

---

[1] To the extent that any of the following conclusions of law may represent findings of fact, the Court adopts them as such.

*Arizona*, 384 U.S. 436, 478 (1966).  While it is well established that individuals must ordinarily invoke the right to refrain from self-incrimination, there are three circumstances under which the Fifth Amendment is self-executing, namely "custodial settings, unless the speaker has knowingly and intelligently waived his privilege to remain silent, extremely limited tax-return-filing circumstances, and situations where the government imposes a penalty if the speaker invokes the privilege to remain silent." *McKathan v. United States*, 969 F.3d 1213, 1224 (11th Cir. 2020) (internal citations omitted).  The first and third exceptions are relevant in this case.

"The right to *Miranda* warnings attaches when custodial interrogation begins." *United States v. Acosta*, 363 F.3d 1141, 1147 (11th Cir. 2004).  To determine whether a suspect is in custody for the purposes of *Miranda*, courts apply a two-part test: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (footnotes omitted).  This test is objective; "the reasonable person from whose perspective 'custody' is defined is a reasonable innocent person." *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996).  When weighing the totality of the circumstances, courts consider the location and duration of the questioning, "statements made during the interview, the presence or absence of physical restraints . . . and the release of the interviewee at the end of the questioning." *Howes v. Fields*, 565 U.S. 499, 509 (2012) (internal citations omitted).  Courts also consider

"whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled." *United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006). "If the individual being questioned were innocent, and was told directly he might leave, in the absence of evidence to the contrary the interrogation was non-custodial as a matter of law." *United States v. Muegge*, 225 F.3d 1267, 1271 (11th Cir. 2000); *see also United States v. Brown*, 441 F.3d 1330, 1348 (11th Cir. 2006). Circumstances where a defendant is found to have been in custody after being told that he was free to leave are generally limited to cases "where the restraints placed on a suspect's freedom are so extensive that telling the suspect he was free to leave could not cure the custodial aspect of the interview." *Muegge*, 225 F.3d at 1271.

Here, the Court finds that Defendant was not in custody when he was questioned by Officer Tidwell. Officer Tidwell began the interview by informing Defendant that he was not required to answer any questions and that he was free to leave at any time. Defendant was seated in the front seat of an unmarked, unlocked vehicle and was not handcuffed. While the law enforcement officers in the vehicle were wearing weapons, there is no evidence to indicate that those weapons were ever drawn or otherwise used to intimidate Defendant.[2] The interview lasted

---

[2] In *United States v. Crews*, "the interview took place in an unmarked, unlocked government vehicle that was parked on the grass beside Defendant's residence, which weighs in favor of a finding that Defendant was not in custody." No. 3:13-CR-230-J-34MCR, 2014 WL 5690448, at *6 (M.D. Fla. Nov. 4, 2014). "Defendant sat in the front seat of the car and was not restrained in any way. He was not handcuffed throughout the

approximately 24 minutes, at the conclusion of which Defendant opened the car door and exited the vehicle.  Defendant was permitted to move about the premises after the interview and at one point was escorted into the residence to use the restroom.[3]  Simply stated, in light of Officer Tidwell's statements that Defendant was free to go, there is no evidence to indicate that any restraints were placed on the Defendant's freedom that would be extensive enough to lead a reasonable innocent person to believe that he was in custody.[4]

In addition to custodial interrogations, , the Fifth Amendment is also self-executing in "classic penalty situations" where an individual must choose either to speak or to remain silent and face a government-imposed penalty.  *McKathan*, 969 F.3d at 1224.  In cases where a probationer is questioned by law enforcement, a classic penalty situation arises when "the state, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation." *Minnesota v. Murphy*, 465 U.S. 420, 435 (1984).  In determining whether the state

---

interview. Although the agents were wearing weapons, there is no evidence that they ever drew those weapons or touched or physically intimidated Defendant."  *Id.* at *7.

[3] "Courts have repeatedly found that the presence of armed officers at the search location and requiring a suspect to be accompanied around the premises does not escalate an interrogation to a degree that makes it custodial."  *United States v. Blank*, No. 8:18-CR-257-T-36TGW, 2018 WL 4898945, at *5 (M.D. Fla. Oct. 9, 2018).

[4] "[A]n officer's straightforward announcement of [a] citizen's Fourth Amendment status prevents dangerous misreads, helping to protect both officers and citizens." *United States v. Knights*, 989 F.3d 1281, 1291 (11th Cir. 2021) (suggesting that the Supreme Court consider adopting a bright-line rule requiring officers to clearly advise citizens of their right to end consensual police encounters) (Rosenbaum, R., concurring).  In this matter, Defendant was clearly advised of his right to end the encounter.

made an implicit assertion, courts consider the terms of the probation; specifically, whether the probationer is required to answer all questions posed by a probation officer, or merely to be truthful in his answers.  *Murphy*, 465 U.S. at 437; *McKathan*, 969 F.3d at 1226 (examining *United States v. Robinson*, 893 F.2d 1244, 1245 (11th Cir. 1990)); *United States v. Saechao*, 418 F.3d 1073, 1080-81 (9th Cir. 2005).  The court in *McKathan* reasoned that when the terms of probation require that the probationer answer questions posed by the probation officer "completely and truthfully," a reasonable person in the probationer's position would understand that he faced a penalty if he refused to answer.  *McKathan*, 969 F.3d at 1228.  The *McKathan* court also weighed the defendant's subjective belief that his probation was subject to revocation based on the probation officer's statement that "if [he] did not follow the conditions [of his supervised release,] [he]'d be revoked and go back to prison." *Id.*  In cases where a probationer is questioned by law enforcement other than a probation officer, courts consider the role and extent of involvement of the probation officer in the questioning, and the nature of the questions posed by law enforcement.  *United States v. Barnes*, 713 F.3d 1200, 1204-05 (9th Cir. 2013) (reversing the lower court's decision that the defendant was not subject to a classic penalty situation based on the probation officer's involvement in questioning by FBI agents); *United States v. Cranley*, 350 F.3d 617, 622 (7th Cir. 2003) (finding that the defendant was not subject to a classic penalty situation even when the probation officer summoned the probationer to the probation office to be questioned by other

law enforcement officers); *see also United States v. Frierson*, 945 F.2d 650, 661-62 (3rd Cir. 1991).

Here, the Court's findings of fact and credibility assessment of all the witnesses supports that Defendant's interview with Officer Tidwell was not a classic penalty situation. While the terms of Defendant's probation required that he answer all questions posed by probation officers, the terms did not require that he provide self-incriminating responses to questions posed by other law enforcement officers.[5] The mere presence of the probation officer in the vehicle at the time of questioning is not sufficient to create a classic penalty situation. While there may be situations where questioning by outside law enforcement triggers a classic penalty, that is not the case here. As previously noted, courts have opined that a classic penalty situation may arise when a probation officer schedules a mandatory meeting where a probationer is questioned by outside law enforcement, or in cases where a probation officer instructs a probationer to fully cooperate with or answer questions posed by outside law enforcement. In this case, because Officer Cotignola was not directly involved in the interactions between law enforcement and Defendant leading up to or during Officer Tidwell's questioning of Defendant, his presence did not create a classic penalty situation. Officer Cotignola did not require or mandate that Defendant be present at the interview, he did not indicate that the interview was part of the terms or conditions of Defendant's probation, he did not ask

---

[5] Additionally, Officer Cotignola testified that probationers would "not necessarily" be required to answer questions that were not relevant to matters of probation.

10

Defendant questions related to the federal criminal investigation, and he did not instruct Defendant to answer any of the questions posed by other law enforcement officers. In fact, after becoming aware of Officer Cotignola's presence, Defendant was informed that he was free to leave and not required to speak with law enforcement. A reasonable person in Defendant's position would have understood that the questions posed by Officer Tidwell were outside the scope of the terms of Defendant's probation and thus did not require a response. As such, Officer Tidwell's questioning did not amount to a classic penalty situation because Defendant could have refrained from answering without facing revocation of his probation.

The Defendant further asserts that "[b]ecause the questions posed to Mr. Jenkins were relevant both to his probationary status and a separate criminal proceeding; without any *Miranda* warnings; with a probation officer present actively participating; the implication was that any failure by Mr. Jenkins to answer would be a violation of his probation." (Doc. 27, 9). With regard to the questions posed by Officer Tidwell, the Defendant's argument fails for two reasons. First, because Defendant was not aware of Officer Cotignola's presence on the premises when he first agreed to be interviewed by Officer Tidwell, Defendant's agreement was not compelled by a perceived or implicit threat of probation revocation. Second, after becoming aware of Officer Cotignola's presence, Defendant was explicitly informed by Officer Tidwell that he did not have to answer any questions and was free to leave the interview. Even if Defendant subjectively believed that he would be

11

penalized for invoking his Fifth Amendment rights, his belief would not give rise to a classic penalty situation because law enforcement neither explicitly nor implicitly asserted that failure to answer would result in a revocation of Defendant's probation. To the contrary, Officer Tidwell explicitly stated that Defendant was not required to speak and was free to leave at any time.

Defendant also argues that the interview with Officer Tidwell "was an attempt to gain a confession by delaying *Miranda*," (Doc. 27, 11), or in other words, that law enforcement engaged in a prohibited "two-step interrogation" by delaying *Miranda*. *Missouri v. Seibert*, 542 U.S. 600, 604 (2004). A two-step interrogation occurs when a suspect is questioned in custody before being read *Miranda* and is then questioned again to elicit an admissible confession. *Id.* Of importance here, "pre-custodial questioning does not require *Miranda* warnings." *United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006). As previously described, this Court has found that Defendant was not in custody during his interview with Officer Tidwell, thus the *Seibert* two-step interrogation analysis does not apply in this case.[6]

---

[6] It should also be noted that the facts in this case are distinct from those found in *Seibert*. Here, Defendant was initially questioned by Officer Tidwell in the officer's vehicle in the proximity of Defendant's residence. Defendant's post-*Miranda* statements were taken by FBI agents after Defendant had been transported to the Tampa FBI office and after a period of approximately one and a half hours had elapsed after the conclusion of the questioning by Officer Tidwell. It can thus be argued that a reasonable person in Defendant's position could have seen the post-*Miranda* questioning at the FBI office as a new and distinct experience. Thus, even if Defendant had been in custody during the questioning by Officer Tidwell, Defendant's statements to FBI agents post-*Miranda may* not constitute an impermissible two-step interrogation as laid out by the Court in *Seibert.*

However, the Court does find that all statements by Defendant in response to questions by Detective Guzina and Officer Cotignola after the conclusion of Officer Tidwell's questions were given under a classic penalty situation and are thus not permitted to be used in the criminal investigation at issue in this case. "[T]he government can 'validly insist on answers to even incriminating questions' in the course of probation supervision, provided it understands it may not use the required answers in a separate criminal proceeding, as opposed to a revocation-of-probation proceeding." *McKathan*, 969 F.3d at 1225 (quoting *Murphy*, 465 U.S. at 435 n.7). Detective Guzina and Officer Cotignola posed questions to Defendant related to matters of his probation. While Officer Cotignola was not the primary probation officer assigned to Defendant's case, Defendant was acquainted with Officer Cotignola and was aware of his status as a probation officer. A reasonable person in Defendant's position could have understood that he was thus required to answer Detective Guzina's and Officer Cotignola's questions under the terms of his probation. Additionally, based on Officer Cotignola's testimony, Defendant's statements in response to Officer Cotignola's questions were given to the state probation office. If those statements are used as part of a state revocation-of-probation proceeding, they may not also be used in this separate criminal proceeding.

Given these facts, and the entire record before the Court, Defendant's statements to Officer Tidwell were not compelled in violation of the Fifth Amendment, but Defendant's statements in response to questions by Detective

Guzina and Officer Cotignola were obtained in violation of Defendant's Fifth Amendment rights.

Accordingly, after due consideration and for the foregoing reasons, it is hereby **RECOMMENDED** that Defendant's Motion to Suppress Evidence (Doc. 27) be **GRANTED IN PART** and **DENIED IN PART** to the extent that only those statements made by Defendant in response to Detective Guzina's and Officer Cotignola's questions shall be suppressed and all other statements and evidence not be suppressed.

**IT IS SO REPORTED** in Tampa, Florida, this 13th day of May 2021.

ANTHONY E. PORCELLI
United States Magistrate Judge

### NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1.

Copies furnished to:

Hon. Thomas P. Barber
Counsel of Record